CLARK, Retired Circuit Judge.
Appellant was tried under a three-count indictment charging him with the murder of Lewis Wilson, Jr. A jury found him guilty of murder “as charged in Count One of the Indictment.” The only difference between Count One and the other two counts is that in Count One it is alleged that the alleged victim’s death was caused “by hitting him on the head with a semi-blunt instrument” while the other two counts allege respectively that death was caused “by cutting him with a sharp instrument” and “by striking him with a blunt instrument.” At the conclusion of the State’s case, defendant moved to exclude the evidence. Appellant now urges that the State failed “to prove a prima facie case” and that the denial of defendant’s motion to exclude the evidence constituted reversible error. He limits this insistence to a contention that there was no evidence that the dead body of a person that had been found floating in a creek, the only dead body referred to in the evidence, was that of the alleged victim.
In this connection, we note several instances of undesirable vagueness in the evidence as to persons, places and things. For instance, throughout the evidence, the first name of the alleged victim is spelled “Louis” instead of “Lewis” as alleged in the indictment. Furthermore, he is rarely, if ever, referred to as “Junior” or “Jr.” as alleged in the indictment. Apparently neither discrepancy is considered to be important by the parties as both invariably employ the name “Louis Wilson” in their briefs. With this in mind and the fact that at no place in the evidence is there any reference to any Lewis or Louis Wilson, Sr., that could have caused confusion as to the identity of the alleged victim, we are of the opinion that the evidence established that the body of the person found on March 25, 1980, in a creek near State Highway # 231 in Houston County was the body of the alleged victim as shown by the testimony of some of the witnesses. Deputy Sheriff Kenneth Bryan testified that he was present when the body was removed from the creek. He further testified:
“Q. All right, sir. I show you what has been marked as State’s Exhibit No. 2 for identification purposes and ask you is that the body that you removed from the creek?
“A. Yes.
“Q. Does that accurately and correctly depict or portray the scene as the way it was when you observed it out there at Big Creek on March 25?
“A. Yes, sir.
“Q. And who is that, if you know?
“A. That is Louis Wilson.”
Chief Deputy O. E. Jones testified:
“Q. Chief Jones, back on March 25th of 1980 this year, did you have an occasion to go out to the scene here on Big Creek here in Houston County?
“A. Yes, I did.
“Q. Were you there when the body of one Louis Wilson was recovered from the creek there?
“A. Yes, I was.”
In our opinion, the evidence was sufficient to warrant the submission to the jury of the issue as to defendant’s guilt and to withstand the defendant’s motion for a new trial, which the court overruled. The evidence presented by the State was to the effect that the alleged victim was never seen alive after Sunday, March 16, 1980, that on the night before he and defendant had been at the home of defendant’s wife or ex-wife and that defendant had been heard to say that if Louis Wilson “didn’t stop hanging around his wife he was going to have to hurt him.”
According to further evidence presented by the State, the body, at the time of the prompt autopsy thereof after it was found, “was in a state of moderate to advanced post-mortem decomposition” and the cause of death was “multiple blunt force injuries, multiple stab wounds or sharp force injuries.” Although no witness testified definitely that the body was attached to anything in the water, there are references in the transcript to its attachment to a concrete road marker that was in the water, *467 which marker had been removed from a nearby road. There was definite evidence that attached to the road marker was wire from coat hangers. There seems to be no dispute as to the claim by the State that the body had been attached to a part of the wire that was attached to the road marker.
There was testimony on behalf of the State that the road marker referred to above was the same road marker that had previously been positioned along a road at a point where the nearest house therefrom was that of defendant’s brother, with whom defendant had been seen on the last day or night on which the alleged victim had been seen alive. There was testimony by one or more of the witnesses that, soon after defendant was apprehended on or about March 26, 1980, pieces of concrete were found in his automobile, the automobile he was driving on or about March 15 and 16, 1980, and that the hood of the car, which had on or about March 15 and 16 been in a wreck was tied down by wire of coat hangers. An expert witness called by the State testified that pieces of concrete found in defendant’s automobile “possessed the same physical characteristics and composition” and “could have had a common origin” with the concrete composing the road marker that was found in the creek. The witness also testified “that the coat hangers from the hood of the automobile” had “the same wire dimension as those found around the concrete marker ... two point four millimeters in diameter.” A stain was found in the automobile, but tests for the presence of blood were negative. The witness also testified that tests for blood on clothing that defendant probably wore on March 15 and 16,1980, were negative. The wire of a coat hanger found in the passenger compartment of defendant’s automobile, as well as some coat hangers that were observed that had been in the house of defendant’s brother, did not have the same dimension as the wire of the coat hangers attached to the road marker.
The defendant did not testify, but witnesses called by him testified as to his whereabouts during a considerable part of the night of March 15-16, 1980, and the daytime of March 16. His two sisters testified that about “11:30 or 12:00” that night he came to the house where they all were living, left there about “6:30 or 7:30 that morning in his car” and returned with his brother about 10:30 the same morning. The testimony of one or more of them was to the effect that his clothes were not bloody or dirty, that they were not “messed up.”
Other witnesses called by defendant testified that, on Sunday, March 16, 1980, the defendant and his brother came to their houses along Highway 231 “close to the Florida State line” selling pocketbooks. One of them testified that “he had just poured some concrete around his house which was loose concrete.” The wife of defendant’s brother, Eddie Rivers, testified that “Eddie got home” on the night of March 15, 1980, “around 11:00, 11:30” and he was at home “until 7:00 o’clock the next morning” when “he left” with the defendant. According to her testimony; the two men returned about 2:30 or 3:00 that afternoon. She further testified:
“Q. When Wallace came home with Eddie at 2:30 or 3:00 o’clock that afternoon, was Wallace’s car messed up?
“A. Yes, it was.
“Q. Did Wallace tie his car down?
“A. He asked me for something to tie the car down.
“Q. He tied it down at your house?
“A. Uh-huh. (Affirmative response)
“Q. What did he tie it down with?
“A. I don’t know. Because, I just told him to look around he might could find something.
“Q. He might could find something?
“A. Uh-huh. (Affirmative response)
“Q. He and Eddie were drinking when they came home.
“A. Yes. They were drunk.
“Q. They were drunk?
“A. Uh-huh (Affirmative response).
“Q. How long were they there?
“A. They were there until about 7:00 o’clock that evening.”
*468 That defendant’s brother, Eddie Rivers, was with defendant on the night the alleged victim was last seen alive and the greater part of the following day is unquestioned and hardly questionable. He did not testify in the case.
But for certain expert evidence introduced by the State on rebuttal, the previous evidence of the State as to the presence of pieces of concrete in defendant’s automobile when it was searched for clues would have been nearly, if not completely, neutralized by the evidence presented by the defendant as to the presence of loose concrete at a house in the vicinity of the area visited by defendant and his brother on Sunday, March 16, 1980. Such rebuttal evidence is found in the testimony of Mr. Charles F. Brooks, a crime laboratory analyst of Enterprise Laboratory of the Alabama Department of Forensic Sciences, who said, inter alia:
“Q. Mr. Brooks, I refer you to the concrete chips you stated that you found in the Defendant’s car. I will ask you if the concrete was relatively fresh, two or three weeks old and would it have the same physical characteristics as the concrete chips that you found in that car?
“A. I don’t believe so, sir.
“Q. All right.
“MR. CARTER: I object to that.
“MR. SORRELLS: Judge, he is giving an opinion.
“THE COURT: He has been qualified as an expert. His testimony is strictly as an expert, opinion evidence. And, I overrule you.
“THE WITNESS: There is a visible difference between concrete that has been, that has been poured for a long period of time. Primarily due to the leaching of the elements, rain, sun, what have you.
“Q. All right. Now, I refer you back to State’s Exhibit No. 9 [road marker]. I am asking you if you found anything on there, on the front part or the back part, any material on that marker?
“A. Yes, sir. I found some mud from the scene. I also found some red mud on there that had colored the concrete.
“Q. Was the red mud in the concrete?
“A. It was in the concrete or leached into it.
“Q. I refer you to the chips that you found in the Defendant’s car. Did it also have this red change on them?
“A. Yes.
“Q. I believe that you testified about a door flashing in the back seat of the car?
“A. Yes.
“Q. And were there any abrasions on that door flashing?
“MR. CARTER: Judge, I am going to object to that as not being anything on Rebuttal.
“MR. SORRELLS: I was trying to rebut the evidence from the concrete coming from some other place, Your Honor.
“THE COURT: Yes, I overrule you. “BY MR. SORRELLS:
“Q. Did you see any abrasions on that door flashing?
“A. Yes, sir.
“Q. Was there any concrete in that door flashing?
“A. Yes.
“Q. Was it, any of it embedded in that door flashing?
“A. Yes, sir.”
The testimony as a whole as to the pieces of concrete found in defendant’s automobile when considered with all the evidence in the case points strongly to defendant as one of the participants in the homicide of the alleged victim.
We find no error in the record prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.